This is our last case today and it is Welch v. Millikin, that's case number 4141012, for the appellant Randall Wolter and for the appellee David Miller, also appearing Carolyn Cassidy, who as I understand will not be arguing. Is that correct? That's correct. Alright, very well. Mr. Wolter, would you proceed please? Good afternoon. This is Randy Wolter on behalf of the appellant in this case. You'll probably learn shortly, Mr. Miller and I have a little different view of the facts in this case, but here's our view, and that is at the time that Millikin entered into an agreement with Wagonhut, they had had a security department in effect for a number of years. It had a director, Mr. Bickler, second-in-command, Deanna Luthi, and then equipment that they used for the department, physical presence at the university, and they always had security officers, whether they were employees of the school or third-party independent contractors, who filled the role of going out and doing patrols and all the other work that the security officer was supposed to do. Nothing changed when Wagonhut came into the picture. All they did was supply security officers who filled those roles. The director was still Mr. Bickler. If you read his job description, it's been the same before and after. He made all decisions regarding security. Second-in-command remained Deanna Luthi, although she became what was called a captain, sort of a military hierarchy. And if you look at the depositions of the people who actually worked there day-to-day, and it's interesting that the defendants never cite any of the depositions of any of the security officers that were supplied by Wagonhut. They only talk about depositions of Ms. Luthi and Mr. Bickler. The people who worked there say all these decisions were made by the Wagonhut people, Mr. Bickler and Ms. Luthi. Who went out at what time, what equipment they used, when they went, whether they went individually or in pairs, all those decisions were made by that hierarchy, made by the director or the assistant director. They also testify that they were trained. In several areas in their brief, the defendant says that Milligan was not involved in training, but that's not true. They were. If you read Mr. Bickler's deposition, he admits that he spent weeks training these people. They also mention the difference in experience. Mr. Bickler spent 25 years on the Decatur Police Department and remained in contact with them. Of course, they abut the city of Decatur right there. And he spent eight or nine years by then as director of security for the university. My client, a high school graduate, never policed, never military, and had spent a few weeks in training. So the experience was at the head of the hierarchy as it should be. What that means is that none of these issues that we've spent so much time on are really important. Once they retained control over what the Wackenhut employees could do, they had the duty to use reasonable care to keep them safe. Their position is, well, we hired Wackenhut, they took over the whole department, they ran everything, they made all the decisions. Well, if that were true, why was Mr. Bickler the highest paid member of the security department? Why is he there? Why is the Andalusian still there? Why are they getting log reports every day? And why are the people who work there day to day saying, all these decisions were made by Milligan people, not by Wackenhut people? And secondly, it makes the written contract meaningless. We've cited the case law, which is all in accordance. It's not what's in the written contract that counts, but what reality is. If the contract says, Wackenhut, you're an independent contractor, you take over the security department, and they do that, that's fine. We wouldn't be here, because Milligan wouldn't have any problems that way. They wouldn't have had any responsibility. But that's not what happened here. What happened is Wackenhut provided security offers that fit in with the security department that was already in existence. Nothing changed in that department. The equipment stayed the same, the director stayed the same, the patrols stayed the same, the Milligan publications that talked about what security officers should do stayed the same, everything was the same. So it's not the contract that controls, it's reality that controls. And the reality is that all the decisions that ended up, in my find, being brutally sexually attacked were made by Milligan people. The decision to use the ATV that was breaking down all the time, that you needed to charge all the time, and the headlights wouldn't work, directed by Milligan personnel. The decision to send out one person at night by herself, Milligan personnel. And this is regardless of the fact that the security officers, particularly the females, and their deputies had said, look, we went to the Milligan people, we told them this is dangerous, it's dark there, there's nobody there, there's no students around, we shouldn't be going there by ourselves. The reason they did is they were directed to do it, and they were directed to do it by Mickler and Luther, no one from WAC, it was Milligan that sent them there. So, it also dismisses any policy, public policy issue that the defendant has raised. What I'm suggesting doesn't, if anything with public policy, that a university could turn over security to a third party. That's fine, if they do it, that's fine. But, what public policy says, and which makes sense to me, is if they retain control over it, then they are responsible. And that's what we're saying. They did not just turn everything over, they still controlled that department. Which I think gets us to the real crux of the case, and that is, was the criminal attack foreseeable? And the circuit court judge says, you know, the testimony was, we're not aware of anybody ever being attacked at that particular location. So we're going to say, we're going to hold, we're going to dismiss this case, because there was no reason to foresee that that was going to happen. But I think there's two reasons why that's wrong. One is, and I want to read this because I want to get it correct. This is the sentence that the defendant opened with in her motion to dismiss the claim. And it appears over and over again in their defense, both in that motion and in their brief. And it says, this is a curious case in which a security officer is suing the client of her employer for the consequences of a criminal attack which she was hired to prevent. Well, if she was hired to prevent such criminal activity, how can they turn around and say it wasn't foreseeable? I mean, we agree that the security officers, part of their job was to be the front line of any kind of criminal activity. And obviously, sexual abuse, violent crime are big issues for universities these days. So if she's hired to play that role, how can they then say this was an unforeseeable attack? I mean, she was supposed to be the first line of defense. You know, you bring it up, but it's not evidence. It's not testimony of a Millikan employee saying, yes, this was foreseeable, or yes, we knew about things that could make this foreseeable. You're picking out a line from a response of pleading that was drafted by a lawyer. It's not something that we can use in determining whether or not summary judgment is appropriate. Not evidence. So from the evidentiary standpoint, is there something beyond the statistics that were set forth for the campus and not for this particular area that would lend credence to your argument that it was foreseeable? Well, we think so, and that's the second part of the argument. And the first one, I think you could say that, I mean, we can make admissions for our clients. But you're not suggesting that's an invention? Well, when they say that's why she was hired, sure. The second thing is that we think there is evidence of that. And the most important one is, again, it's the testimony of the women who operated the security offices. Because their testimony is, look, we told them that's a dangerous area. We know that there's a crime area right over those railroad tracks. We shouldn't be going there alone at night. Particularly when there's no students around, which is what happened here. The students were on vacation, so there were no students. They weren't saying, we're scared to go to the library, or we're scared to go to the gymnasium, or we don't want to go to a boys dorm. They said, we don't want to go to this dark area where there's no other people around, and you can't see the street from there.  And that area is open to the public. It's right by a viaduct. You just walk through there, and you're right on the campus. Or you can walk on any campus. You can walk on this campus. So that's the main reason, is that they were told it's dangerous. We don't want to go there. And they're not only sent there, but they're sent there unarmed, individually, and with a piece of equipment that makes it that much more dangerous. I mean, they ask, can we just use one of the cars you have to go over there? So we don't have to keep jumping this thing and spending time in the dark, fooling around with a piece of equipment. No, it's too expensive. Just keep using the Gator ATV. Well, this is the second time that night my client was jumping that vehicle. So instead of being out of there, or being attentive to what was happening around her, she's trying to recharge this ATV when she gets jumped by these three males and sexually assaulted. And the other one is, I don't know how many crimes there has to be, but we've listed all those things that happen in a couple years, not only on campus, but right next door. And it seems to me sort of unreasonable to exclude this 20-by-20-foot area that is close to that crime area, and dark, where students normally aren't.  To me, it would be reasonable that they'd be responsible for any crime that happened on campus. That's where they're sent out. That's what they're supposed to do, is keep their eye out, and let us know if there's any untoward activity. And if you need help from the police, radio, we've got this. What was the situation in terms of the lighting? Was it that light poles were present, but the lights just weren't working? Or they just weren't there? Well, insufficient and not working. I think, as Shanae Enoch in her deposition said, the place is pitch dark, which is one of the reasons they don't want to go there, one or two or three in the morning. And we've cited cases where that's enough to have proximate cause. It's not the only issue here, but the testimony was it was totally dark there, which makes the fact that there's headlights that don't work and the APD even that much more important. So their response is, well, you're supposed to do work orders, and then we have Aramark come out and put a light pole. But those work orders were turned in, and we didn't have authority to go change them. And if Aramark's working for Milligan, Milligan's still responsible. I guess that's why they're on the case. They brought Aramark into the case. Same thing with the ATV. There's no question that everybody knew this thing was a piece of junk. It didn't work. They shouldn't be out there with it. They kept using it and kept using it. So we mentioned other reasons why we think that the defendant had a duty in this case, but I think that's the main one, because they kept control over what the security officers did. And it doesn't have to be complete control. I mean, the language is very broad. If you keep them from doing it the way they want to do it, or I guess the word is freely, then the contractor, in this case Milligan, remains responsible. Our position is they not only kept some control, they kept total control. Every decision that had to do with this case was made by Milligan personnel. The other argument is, well, Wagon Hood agreed with how many people they needed, but it's Milligan who decided how much they wanted to pay, which determined how many security officers there were available, which determined how many security officers could go on a route. So even if you look at it that way, they had control over how many people. How many security officers were available during that time period? Well, I think that particular evening there would have been a total of four, including a dispatcher, but one gentleman was ill, so they were down to three. Would the individual officers have been able to say, we're going to do that route together? No. I mean, they asked. If you look at those depositions, one of the reasons they said it was dangerous, we don't want to go there alone, but they were told to go there alone. The director of security, who actually, if you read his job description, is a lot more than that, right? Oh, he's the head guy. He does everything. No, but I mean, things that don't have anything to do with security. Well, you know, I think it's all security. You might include in their physical plant, but they sort of consider that part of security. Okay, not all of it. Public safety, forget the terminology. He told them how to do their routes, and if three of you are on duty, only one of you can go to that route? That's the testimony of the people who work there. Are these verbal directions? As far as I know, they're verbal. I've never seen a written schedule prepared by anybody. And the record shows that Mickler had individual conversations with officers and told them that's how they had to do it? Well, my guess is it's going to be Luthi, because she sort of translated everything to them. But yes, I mean, these people saw themselves as employees. They weren't making decisions. My client was just doing what she was told. She had no authority to tell anybody at Milligan what to do. Well, in that vein, in your brief, and I just wanted to know if this is substantiated by deposition testimony directly, that it's indicated, and I'll just quote, there's no dispute that defendants ordered Ms. Welch to go to the dark, remote area of the heating plant alone at 1 a.m. and directed that she use the Gator ATV that was known to be regularly inoperable. Did a witness identify the defendants as having made those directions, given those directions? I think all the women who worked there, which would be Enoch and Govay and my client, all testified that they complained about this piece of equipment going to a certain place alone, but they were all directed to do that. But as opposed to Wackenhut directing it as opposed to Miller? That's their testimony. Now, Mr. Michler and Ms. Luthie gave different testimony, and maybe that's why this is a question for a jury, and Mr. Miller's probably going to cite Ron Burke, but Ron Burke said yes to everything. I mean, Ron Burke also said any directive that was given by Michler or by Luthie had to be obeyed, and they're the head of this place. I mean, they're the director and the captain, and the hierarchy goes down from there. Let me give you the converse of that. Right after this attack happened, an email went out. I mean, immediately went out, and it said no more of these patrols by one person. They're all going to be two people. Isn't that remedial? Huh? Isn't that remedial? Well, the only reason I'm saying this is to show you who has the authority to make these decisions. That email came from Michler through Luthie. It did not come from Wackenhut, and everybody testified we expected that to be obeyed, so they took the ATV out of service, changed it from one to two people on a patrol. They could have done that any time. Wackenhut couldn't do it. Millican could have done it, but it was after the force was out of the barn that they made that decision. So, yeah, it's remedial, but it shows that the big issue here is who had control over my client, and that just supports the fact that the control was with Miller, not with Wackenhut. Wackenhut never even indicated that they had the right to take the ATV out of usage or to change the number of people on a patrol. They just provided the bodies that filled in slots that were already there. Stayed the same after they left. Michler and Luthie are there after they go. They still have routes. I mean, nothing changes before or after. So, I don't know how much time I have left. The yellow light comes on when you've got two or three minutes left. All right. The only other thing I want to talk about is this condition, or the issue, and it's a problem, I guess, for all plaintiffs lawyers, trying to decipher condition versus proximate cause. And defendants refer to a lot of cases to say that what was created here was a condition, not proximate cause. At first, I had a jury on its side, but that's a separate matter. All those cases involve a defendant who has nothing to do with the plaintiff, whether it's putting up a barricade or parking the bus or whatever it is. And in this case, the defendant had everything to do with the plaintiff. And my client wasn't at that location out of her own goodwill. She was there because she was told to go there. They also involve some kind of discretionary act, some negligence on behalf of the plaintiff, and no one's ever claimed that Ms. Welch had any discretion in this case, that she had to go there, or that she didn't have anything negligent. She was just doing her job. In your view, was she required to use a vehicle? Yeah. Why? Well, the reason it comes up in the depositions is they choose the most economical. No, no. Yeah, most economical, which is a walk. Well, yeah. That's what I meant. If you read the depositions of the females, that was their other choice. If you don't want to use the ATV, then you've got to walk. Well, they took the ATV. It would be hard to meet their time frame. Did they walk from one place? Did they actually, did they clock? Or did they just represent that they did what they were supposed to? I think the dispatcher records every time they get to one of their locations. So I would use the radio to tell the dispatcher I've just finished at the power plant. Right. Yeah, I don't think it was like an automatic clock. I just think they radioed in. I want to try to ask this delicately because I am aware of the concern about violence in general on campus, but violence across the country, violence against women and sexual assault. But you keep referring to the women didn't want to do this. Is that a factor? Or is it that no officer, whether male or female, regardless of their age, if they're qualified to do the job, they'd be in the same situation, wouldn't they? Well, the reason I raise this, Judge Harris says other than what I call an admission, what reason do they have to know that this could happen and why was this foreseeable? And one of my answers is the women told them, we don't want to go there. And I suppose they feel more at risk than you or I would if we had to go there. Well, is that a factor? Well, sure. Well, I've got a cell phone and a wallet and a radio and whatever equipment I've got on me. I understand there's a difference, a qualitative difference, between a sexual assault and a mugging or a battery, but that's not the injury. We're talking about whether any injury would occur. Right. Does it make a difference that it was a woman and a sexual assault? I mean, you're adding that in. I'm trying to understand whether that's an element of the case. Well, to me it is, because I think most women would tell you they think they're more at risk, and militants should have been responsive to that. Well, how would they be responsive to that unless they told Wackenhut you can only hire a male? You can't tell Wackenhut anything. Let him take a car. Or don't go tonight because the other male. I don't understand how the ATV protects you, other than it's a little quicker. The ATV. Or a car. Yeah. You've got to get out of the car to do the work. But here's the thing with a car. It works. That's why they want it. But you've got to get out of the car to check the doors or whatever you're doing. But you didn't have to spend time radioing to get the jumper, which you did earlier in the night and used it and had it with her then, and then now, instead of getting in and leaving, plus the car would have had a horn, headlights, it would have been faster. I'm serious. You'd have been out of there. It wouldn't have happened. Has that answered your question, Justice Connelly? I think so. Okay, then you're out of time. But you will have rebuttal. Mr. Miller. Thank you, Your Honor. And may it please the court. Thank you. Counsel. Mr. Walters and I do agree with one thing, and that is that we profoundly disagree as to what the record upon which this appeal is based contains. And I've been doing this for a number of years, and I have to say, and I don't use the term loosely, that this is the most monstrous distortion of a record that I have ever seen. We filed a motion to strike portions of the record at the time of the summary judgment hearing, and these were the same portions of the record that this court just heard. And that is attached, that motion is attached, as are supplemental appendix. Did you obtain rulings on the motion to strike the response or the motion to strike the affidavit of Ms. Welch? No, as you will see, Judge Weber said that he believed that the record was sufficiently clear for him to enter summary judgment without ruling on the other pending motions. And that appears as a part of his order from which this appeal is taken. Now, we have spent an immense amount of time going through every single deposition and every single citation, and that effort is set forth in the supplementary appendix. Nothing could be farther from the truth than to say that the security department at Millikan was operated the same, just plugging in bodies from Wackenhut. The quote that I read to Mr. Walters from the brief, and do you recall that quote where I indicated it says, there is no dispute that defendants ordered Ms. Welch to go to the dark, remote area of the heating plant alone at 1 a.m. and directed that she use the Gator ATV that was known to be regularly inoperable. Is there a dispute? There is absolutely no dispute that that was not said, that there were no directions of that type. Is there any evidence that supports that statement in the record? No. The record shows that the Millikan entered into a contract with the world's largest security company, Wackenhut. This isn't your cousin around the corner who's looking for a job. They entered into this contract on a turnkey basis for Wackenhut to provide the security. The contract itself, and if you look at the provisions of the contract, it would be what you would expect. Millikan is saying we want security pursuant to these guidelines. A good example would be that we want hourly patrols at the boiler plant. And they enter into the agreement with Wackenhut saying we will provide those specified services. And they agree on what the compensation to be paid is because, as with any contract, there is a price. So Millikan buys the security services. The security services are that security will be provided by Wackenhut security employees under the sole and exclusive control of Wackenhut. There is nothing in there that says that Millikan has any role other than saying this is what needs to be done. You staff it. And you provide the employees and train the employees and tell the employees how to do the work. So if we're looking at section 414 of the restatement in a control type of scenario, what we're saying is that the owner or the contracting party to the contract is saying this is what we want done. Wackenhut is saying we will do it. And it is our expertise in doing this, our control over these employees who are our employees. There is no testimony by the plaintiff saying that Millikan, Michler, or Luthi said to her, You do this on an individual basis. You use this gator. You go to this site. All of those directions came from her employer, Wackenhut. So to say there is no dispute on the issue puts it antipodally because there is no dispute. It never happened. Millikan never said a word to the plaintiff about using the gator, about going alone, about what to do other than saying to Wackenhut, We want to have patrols at the boiler house on an hourly basis. And if we look at the testimony of the people who were charged with knowing and implementing the contract, we have Ron Burke, who is the supervisor for Wackenhut, and he says, Yes, this was a turnkey proposition. We controlled our own employees. We staffed them. We told them when they were to do the work. We knew what it was that Millikan wanted done, and it was up to us to use our employees to get it done. And it was up to us to decide what equipment. And Millikan provided a, I don't want to say fleet, but there were maybe three or four vehicles of which the gator was one, that Wackenhut could have used and could have assigned for the use of its employees. Michler also testified this was a turnkey proposition. We paid these experts in security to provide security for the campus. They were to staff it, and they were to instruct and to train their employees, and the same is true of Luthi. Now, we have some ad hoc references being made to the female security guards for Wackenhut, and their testimony is what is the subject of the motion to strike, because it is based uniformly on hearsay and on their conclusions and on their understanding of how this operated, not that they received the specific directions or instructions from either Michler or from Luthi. Now, as far as the maintenance is concerned, this was a turnkey proposition on the other side with Aramark. So any complaints regarding either the lighting at the power plant or the condition of the gator, that was for Wackenhut to report by computer email to Aramark and for Aramark to repair. So Millikan had hired the experts on both sides of this, and it is intriguing to see if there is any theory upon which you can say that the employer of a contractor under circumstances like this is liable, particularly when you hire a security service such as this to provide security for the campus, and you then are blamed for not providing security for the people who were to secure the campus. Now we're talking, and I think the court raised questions, and certainly Judge Weber did as well, about the area where this attack took place. And this is a prototype example of what I refer to as distortions of the record. We have statistics which are campus-wide over a period of years, none of which have anything to do with the boiler plant. Well, so as I read your argument in the brief, the fact that the statistics aren't specific to criminal activity in the boiler plant lot or that specific area, that they're of no value in determining foreseeability. And isn't that a pretty restrictive view? I don't think so because of the size of the campus and the nature of the campus and the number of people upon the campus. If you look at those statistics, and I don't think that we have to put on blinders to appreciate, and I think Justice Kinect made the point, albeit somewhat over-likely, that we have a concern for sexual assaults or rapes on college campuses. That is of the female students by the male students. So what we're doing is throwing into the hopper here, saying it would be foreseeable that there would be a sexual attack by three criminals, identities unknown, at the power plant where nothing like this had ever taken place before. And C, we can establish the foreseeability by showing that there was student-on-student sexual assaults on the campus during the two years preceding. I think it is important, if we are going to focus upon whether or not Millikan knew or should have known that the plaintiff was likely to be sexually assaulted in performing this round, which was a regular round on an hourly basis during the day, the fact that there had never been any criminal attacks of any sort at this area. And during the argument before Judge Weber, if we want to talk about the admissions and we set it forth in our brief, Judge Weber was curious and is saying to Mr. Walter, the court, Mr. Miller argues that there have been, at least in this record here, no instances reported of crimes committed at the boiler room. Is he correct or incorrect about that? Mr. Walter, as far as we know from discovery, I am not aware of any incidences where there was injury at that particular, a crime at that particular place. The court, so if the Wackenhut personnel are saying it is dangerous, we can't go there. Upon what basis am I to assume that their fears are well-founded? Because Mr. Miller says there is no history of criminal activity in that area. Mr. Walter, again, the court, I mean, why isn't it monsters under the bed? Mr. Walter, because they have already admitted here today that this was an inherently risky job where they sent her. They are not saying it was inherently risky just because they sent her to the boiler room, but maybe they will say that. But they have said it is inherently risky. Everybody knew it was a risky job. And that's why Milliken hires Wackenhut to provide security for the campus so students and other persons, invitees upon the campus, are safe. Where does it stop? The other example is the, I have difficulty pronouncing this, so forgive me, the Kolodichek case. Where the court said, and this is dealing with a shopping mall, a Melvin Simon shopping mall, which would be a fraction of the size of the entire Milliken campus, that it is absurd to say that by providing a security service in the mall that they undertook a duty of any kind to provide safety here to the other security people. There it was an employee charged with trailing shoplifters who was shot. The public policy has got to stop someplace. And then you get Fancel versus QSE Foods where it was the police officer who making his rounds was shot by a hidden criminal. And they said, well, that's the nature of providing the security service. Admittedly, police are different than the unarmed security people provided by Wackenhut, but if you focus back on Milliken as the employer of the security people, they should not be liable as a matter of public policy if the security people are assaulted unexpectedly upon the campus. That's what the security service is there to protect or guard against. We do not have, in my way of thinking, any basis, at least in the law, and we're all lawyers here, so we all like to look at the legal theories that control cases. Under Section 414, there is no duty on the part of the Milliken as the owner under any of the standards. Mr. Miller, it's my understanding the boiler plant was to be inspected every hour on the hour, is that correct? That's my understanding. And that was a directive from Milliken, is that correct? That's right. And that was passed on to those responsible by whom? That would have been passed on at the time the contract was negotiated. Is that in the contract? That would be in the guidelines for the contract. That would be in what are known as the post orders. If you look at the contract, it says that Wackenhut is to perform the work in accordance with the schedule, and the schedule is what assigns the number of people. The two of them had agreed on the number of people to provide whatever services, and agreed that that was reasonable. Then the post orders and the guidelines were what the people were to do. And in what the people were to do, that would include hourly inspections of the boiler area. You know, maybe every two hours you would inspect the campus library. Okay, you lost me. Is it in the contract, the hourly inspection, or is that something outside of the contract? It would be adopted in the contract, I believe, in the post orders. In the post orders? Yes, and I think that the contract refers specifically to the post orders. It's like a master contract that says the contract documents include the architectural drawings, the specifications, the general conditions, and all of that. So we submit here there was no duty under any theory. If there was a duty under any theory, then it had to be to exercise ordinary care with respect to hazards that are known or should be known. There were no hazards connected with the boiler plant as far as the lighting on the boiler plant is concerned. That was the plaintiff's job to turn in the reports back to Aramark so that the lights would be changed. I'd be happy to answer any other questions. I see none. Thank you very much. Is there rebuttal? Yes. Okay. Judge, I looked at the job description, and I think it is unlimited to the Department of Security, everything that's said about what his obligations were, which begs the question, if this was turned over to WAC and HUD, why are they paying Nicola or Lucy? What are they doing every day? Why are they there? Why are they running the department? And in terms of Ron Burke... Well, somebody has to make sure WAC and HUD does its job, don't they? Well, if they're... Yeah, but not just overlooking them, they're directing them. They're using Millican equipment. Here, let me read this. It refers to Ron Burke. Here's something we cite in our briefing. The decision to do those hourly boiler room runs was made by Millican, correct? Yes, ma'am. Okay, and no way, shape, or form was a decision made by WAC and HUD? No. Okay, and certainly not a decision made by you, correct? No, ma'am. Would you agree that a decision such as that would be something that would have to come from Mr. Luthi or Mr. Mickler? Yes, ma'am. And just based on the chain of command and the nature of the contract that you had with them, that they who know advised you to do something, it was our responsibility, WAC and HUD's responsibility, to follow through with that, correct? Yes, ma'am. So even Ron Burke is saying these decisions, where to go and when, were made by Millican people. There was no choice. You had to do it. Georgia Welch was there at 1 in the morning because Millican directed her to be there with equipment that Millican supplied. To say that WAC and HUD made the decision to use the ATV is ridiculous. They didn't even own it. And there's no evidence that they've made any communication with Millican at all about equipment that was available. You know, I'm accused of monstrous distortion, but all I can say is look at the depositions of the people who work there day to day. They all say, we were told what to do by Millican. If I remember correctly, my client says, when I first got there, I actually saw Deanna Luthi writing the schedules. Who was going to do what patrols at what time? She didn't see it so much after that because after the training she was on a night shift and Luthi wasn't there. But our position is all that was done by Millican personnel. I find the reference to Fancel highly offensive. There's absolutely nothing consistent between the Fancel case and this case. The police officer was trained. He had his own equipment. He was at that location by choice, not by direction. It's the exact opposite with Ms. Welch. She's there because she's told to be there. She's unarmed. She's got equipment that doesn't work, and she's by herself. These are two totally different situations. There was nobody directing that police officer to go there. Even Ron Bergson, the only reason he went to that boiler plant is because Millican told us to go there. The big issue, I think, is what Judge Harris raises, and that is can we really take the work area in this case and limit it to 20 by 20 feet or 30 by 30 feet where this happened? Crimes are taking place throughout the campus, serious crimes. Serious crimes are taking place within a few feet in the city of Decatur. Mittler worked there for 25 years. He's in contact with them. He's never denied he knew about all those. There were aggravated abandons. There were sexual assaults and robberies. This is in the middle of that. It's between that area of Decatur and the campus. So they know of all of these. In the cases that I've read, it's way more crime than in the other cases that are cited. It's where they hold that it's foreseen. In the Chicago Railway case, there's not even a sexual assault that's mentioned. It's just the number of crimes in a railroad car in a certain period of time. Two other things quickly. One is the issue about the size of the campus and how easily corrected this would be does come up in some cases. Well, how easy was it to correct this? It's the email that was sent out an hour after it happened. You send somebody with it or you use better equipment. They could have done it at any time, at little or no cost. The reason they didn't have more people there is they had a budget. If they would have asked more people, Wagonhut would have provided them. They're happy to do it. That's how they make their money. And finally, post orders have nothing to do with this. If you read our reply, because they raise it again, they've never put the post orders in this record. The post orders contain a table of contents, a talk in general terms that was written by Wagonhut. The key pages post-date this contract by six years and are written by Millikan. It's Millikan telling Wagonhut what to do, not the other way around. And there's nothing in any post order that I've seen that sets up these schedules or says where people go. That was done orally on campus. Georgia, you're working the night shift. Here's the route you're taking. Here's where you're going to go every hour. Here's the equipment you're going to use. That came from people who were on site. No one on site from Wagonhut has the authority to do that. They're all the same level as Georgia Welch's. It came from the director and assistant director who was running the program. For that reason, we'd like to get this in front of a jury. Thank you. Okay, thanks to all three of you. The case is submitted and the court stands in recess until further call.